# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALEX SARRAF, Individually and On Behalf of All Others Similarly Situated, | ) **Case No.** |
| | ) |
| | ) **COMPLAINT FOR VIOLATION OF** |
| Plaintiff, | ) **THE FEDERAL SECURITIES LAWS** |
| | ) |
| v. | ) **DEMAND FOR JURY TRIAL** |
| | ) |
| BT GROUP PLC., GAVIN E. PATTERSON, IAN LIVINGSTON, and TONY CHANMUGAM, | ) |
| | ) |
| | ) |
| Defendants. | ) |
| | ) |

## CLASS ACTION COMPLAINT

Plaintiff Alex Sarraf ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against Defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through its attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, U.S. Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding BT Group PLC ("BT Group" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired the American Depositary Receipts ("ADRs") of BT Group between May 23, 2013 and January 23, 2017, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      BT Group is a multinational telecommunications services company that offers fixed-line services, broadband, mobile and TV products and services, and networked IT services in the United Kingdom and across the world. The Company also sells wholesale products and services to communications providers around the world. Globally, BT Group supplies managed networked IT services to multinational corporations, domestic businesses, and national and local government organizations.

3.      Founded in 2001, the Company was formerly known as "Newgate Telecommunications Limited" and changed its name to BT Group plc in September 2001. BT Group is headquartered in London, England. The Company's ADRs trade on the New York Stock Exchange ("NYSE") under the ticker symbol "BT."

4.      Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company's Italian division had for years engaged in improper accounting practices; (ii) as a result, BT Group significantly overstated its earnings throughout the Class Period; (iii) the foregoing facts, when they became known, would foreseeably cause BT Group to cut its revenue, earnings,

and free cash flow forecasts; and (iv) as a result of the foregoing, BT Group's public statements were materially false and misleading at all relevant times.

5.      On October 27, 2016, BT Group announced that the Company had uncovered "inappropriate management behavior" at its Italian division.  BT Group advised investors that the Company had "conducted an initial internal investigation" which "included a review of accounting practices during which we have identified certain historical accounting errors and reassessed certain areas of management judgment."   Consequently, the Company announced that it had "written down the value of items on the balance sheet by £145 [million]."

6.      On this news, BT Group's ADR price fell $0.57, or 2.39%, to close at $23.25 on October 27, 2016.

7.      On January 24, 2017, BT Group issued a news release entitled "Update on investigation into BT's Italian business and on BT Group outlook."  The news release stated, in relevant part:

> The investigation into the financial position of our Italian business is now substantially complete. ***The adjustments identified have increased from the £145m announced in our halfyear update to a total of around £530m***. We are still evaluating what proportion of the total adjustments should be treated as prior year errors, and what proportion should be treated as the reassessment in the current year of management estimates. Work is also ongoing to establish how these adjustments should be reflected in BT Group's financial statements for the current and previous periods in light of applicable accounting requirements.
>
> . . .
>
> The improper behaviour in our Italian business is an extremely serious matter, and we have taken immediate steps to strengthen the financial processes and controls in that business. We suspended a number of BT Italy's senior management team who have now left the business. We have also appointed a new Chief Executive of BT Italy who will take charge on 1 February 2017. He will review the Italian management team and will work with BT Group Ethics and Compliance to improve the governance, compliance and financial safeguards in our Italian business.

Further, we are conducting a broader review of financial processes, systems and controls across the Group. The BT Group Remuneration Committee will consider the wider implications of the BT Italy investigation.

Gavin Patterson, Chief Executive BT Group plc, said:

"***We are deeply disappointed with the improper practices which we have found in our Italian business.*** We have undertaken extensive investigations into that business and are committed to ensuring the highest standards across the whole of BT for the benefit of our customers, shareholders, employees and all other stakeholders."

. . .

As a result of the outcome of the BT Italy investigation and the pressures in the UK public sector and international corporate markets, we now expect underlying revenue excluding transit adjusted for the acquisition of EE to be broadly flat in 2016/17 and adjusted EBITDA to be around £7.6bn. Normalised free cash flow is now expected to be around £2.5bn.

For 2017/18, we now expect both underlying revenue excluding transit and adjusted EBITDA to be broadly flat year on year. We expect normalised free cash flow to be £3.0bn - £3.2bn.

(Emphases added.)

8.      On this news, BT Group's ADR price fell $5.05, or 20.67%, to close at $19.38 on January 24, 2017.

9.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

10.     The claims asserted herein arise under and pursuant to §§ 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

11.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

12.     Venue is proper in this District pursuant to § 27 of the Exchange Act and 28 U.S.C. § 1391(b).  BT Group's ADRs trade on the NYSE, located within this District.

13.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

14.     Plaintiff, as set forth in the attached Certification, acquired BT Group ADRs at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

15.     Defendant BT Group is incorporated under the laws of England. The Company's principal executive offices are located at 81 Newgate Street London England X0 EC1A 7AJ.  BT Group's shares trade on the NYSE under the ticker symbol "BT."

16.     Defendant Gavin E. Patterson ("Patterson") has served as the Company's Chief Executive Officer ("CEO") since September 2013.

17.     Defendant Ian Livingston ("Livingston") served as the Company's CEO from June 2008 to September 2013.

18.     Defendant Tony Chanmugam ("Chanmugam") served as the Company's Finance Director from 2008 to July 2016.

19.     The Defendants referenced above in ¶¶ 16-18 are sometimes referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

20.     BT Group is a multinational telecommunications services company that offers fixed-line services, broadband, mobile and TV products and services, and networked IT services in the United Kingdom and across the world. The Company also sells wholesale products and services to communications providers around the world. Globally, BT Group supplies managed networked IT services to multinational corporations, domestic businesses, and national and local government organizations.

### Materially False and Misleading Statements Issued During the Class Period

21.     The Class Period begins on May 23, 2013, when BT Group filed an annual report on Form 20-F with the SEC, announcing the Company's financial and operating results for the quarter and fiscal year ended March 31, 2013 (the "2013 20-F").  For the quarter, BT Group reported net income of £555 million, or £0.07 per diluted share, on revenue of £4.81 billion, compared to net income of £632 million, or £0.08 per diluted share, on revenue of £4.87 billion for the same period in the prior year.  For fiscal year 2013, BT Group reported net income of £1.94 billion, or £0.24 per diluted share, on revenue of £18.1 billion, compared to net income of £2.0 billion, or £0.24 per diluted share, on revenue of £18.9 billion for fiscal year 2012.

22.     In the 2013 20-F, BT Group stated, in part:

**Business integrity and ethics**

***We are committed to maintaining high standards of ethical behaviour, and have a zero tolerance approach to bribery and corruption.*** We have to comply with a wide range of local and international anti-corruption and bribery laws. In particular the UK Bribery Act and US Foreign and Corrupt Practices Act (FCPA) provide comprehensive anti-bribery legislation. Both have extraterritorial reach and thereby cover our global operations. As we expand internationally, we are increasingly operating in countries identified as having a higher risk of bribery and corruption.

We also have to ensure compliance with trade sanctions, and import and export controls.

. . .

**BT Global Services**

. . .

The UK is our largest region by revenue. We have a large base of customers in the corporate sector and serve public sector bodies such as central government and local councils.

In continental Europe, we run large businesses in key countries such as Belgium, France, Germany, Italy, the Netherlands and Spain. Current Analysis ranked us second in the German market for pan-European and global IP and data services. In Italy, we are the main country-wide operator exclusively focused on business-to-business services. In Spain, the telecoms regulator ranked BT as the leading alternative to the incumbent operator in the enterprise data market. We also support customers in Central and Eastern Europe, the Nordics and Russia.

. . .

**Corporate governance statement**

***We are committed to operating in accordance with best practice in business integrity and ethics and maintaining the highest standards of financial reporting and corporate governance. The directors consider that BT has, throughout the year, complied with the provisions of the UK Corporate Governance Code*** (the Code) as currently in effect and applied the main principles of the Code as described on pages 63 to 97 of this Report of the Directors.

. . .

**Governance and compliance**

In line with our revised terms of reference, we oversee and monitor BT's governance framework (including our regional approach to governance) so that it continues to be fit for purpose to meet BT's business and organisational goals and is consistent with our approach to risk. We have oversight of our key compliance programmes. These include: ethics and business practices; sanctions and international trade; regulatory compliance; and data preservation and protection in the UK and around the world. We review the process for, and effectiveness of, our whistleblowing procedures, and we have a code of ethics for the Chief Executive, Group Finance Director and senior finance managers as required by the Sarbanes-Oxley Act. We keep under review that the Board and its committees are

appropriately receiving assurances on all major governance and compliance matters.

(Emphasis added.)

23.     The  2013 20-F contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Livingston and Chanmugam, stating that the financial information contained in the 2013 20-F was accurate and disclosed any material changes to the Company's internal control over financial reporting.

24.     On July 25, 2013, BT Group issued a press release and filed a Current Report on Form 6-K with the SEC, announcing the Company's financial and operating results for the quarter ended June 30, 2013 (the "Q1 2013 6-K").  For the quarter, BT Group reported net income of £346 million, or £0.04 per diluted share, on revenue of £4.45 billion, compared to net income of £415 million, or £0.05 per diluted share, on revenue of £4.50 billion for the same period in the prior year.

25.     On October 31, 2013, BT Group issued a press release and filed a Current Report on Form 6-K with the SEC, announcing the Company's financial and operating results for the quarter ended September 30, 2013 (the "Q2 2013 6-K").  For the quarter, BT Group reported net income of £613 million, or £0.07 per diluted share, on revenue of £4.49 billion, compared to net income of £528 million, or £0.06 per diluted share, on revenue of £4.41 billion for the same period in the prior year.

26.     On January 31, 2014, BT Group issued a press release and filed Current Report on Form 6-K with the SEC, announcing the Company's financial and operating results for the quarter ended December 31, 2013 (the "Q3 2013 6-K").  For the quarter, BT Group reported net income of £493 million, or £0.06 per diluted share, on revenue of £4.6 billion, compared to net income of

£450 million, or £0.06 per diluted share, on revenue of £4.37 billion for the same period in the prior year.

27.     On May 22, 2014, BT Group filed an annual report on Form 20-F with the SEC, announcing the Company's financial and operating results for the quarter and fiscal year ended March 31, 2014 (the "2014 20-F").  For the quarter, BT Group reported net income of £566 million, or £0.07 per diluted share, on revenue of £4.78 billion, compared to net income of £555 million, or £0.07 per diluted share, on revenue of £4.81 billion for the same period in the prior year.  For fiscal year 2014, BT Group reported net income of £2.01 billion, or £0.25 per diluted share, on revenue of £18.28 billion, compared to net income of £1.94 billion, or £0.24 per diluted share, on revenue of £18.1 billion for fiscal year 2013.

28.     The 2014 20-F contained signed certifications pursuant to SOX by Defendants Patterson and Chanmugam, stating that the financial information contained in the 2014 20-F was accurate and disclosed any material changes to the Company's internal controls over financial reporting.

29.     In the 2014 20-F, BT Group stated, in part:

**BT Global Services**

. . .

By region, the UK is our largest in terms of revenue. We serve a wide range of customers, with the financial, government and healthcare segments being particularly significant. Current Analysis ranked us as the number one provider in the UK public sector market, as well as a leader in the UK IP telephony and unified communications market.

Continental Europe is our second largest region, but the slow economic recovery makes this a tough market as corporate customers continue to look for ways to make savings. We have a strong presence in this region with national networks and metropolitan fibre rings in most major markets. We focus on certain key countries such as Belgium, France, Germany, Italy, the Netherlands and Spain. In Italy, according to the telecoms regulator, we are the leading operator of those dedicated to business-to-business services. In Spain, the telecoms regulator ranked BT as the

leading alternative to the incumbent operator in the enterprise data transmission market.

. . .

**Business integrity and ethics**

***We are committed to maintaining high standards of ethical behaviour,*** and have a zero tolerance approach to bribery and corruption. We have to comply with a wide range of local and international anti-corruption and bribery laws. In particular, the UK Bribery Act and the US Foreign and Corrupt Practices Act (FCPA) provide comprehensive anti-bribery legislation. Both have extraterritorial reach and so cover our global operations. As we expand internationally, we are increasingly operating in countries identified as having a higher risk of bribery and corruption. We also have to ensure that we comply with trade sanctions, and import and export controls.

. . .

**Corporate governance statement**

***We are committed to operating in accordance with best practice in business integrity and ethics and maintaining the highest standards of financial reporting and corporate governance. The directors consider that BT has complied throughout the year with the provisions of the UK Corporate Governance Code*** (the Code) as currently in effect and applied the main principles of the Code as described on pages 75 to 115 of this Report of the Directors.

. . .

**Audit & Risk Committee Chairman's report**

"This year the Audit & Risk Committee paid special attention to several overseas locations that are important to BT Global Services, including Italy and Brazil, to data security and to the increasing cyber security threat. We have received detailed presentations from key personnel in each of these areas and reviewed management's mitigation plans."

. . .

**Governance and compliance programmes**

As part of our governance oversight role, we have reviewed a number of BT's core compliance programmes. We received a presentation on the increasingly important data governance programme and endorsed the current areas of focus. We also reviewed BT's proposed conflict minerals compliance programme and received an

update on BT's programme to monitor international trade and sanctions. At each meeting, we received an update on the implementation of our anti-corruption and bribery compliance programme for agents (agents programme) and highlighted the important oversight role that the Regional Governance Committees (RGCs) have to play.

We endorsed a move to a new approach for mandatory compliance training. This includes annual assessment to allow people to demonstrate their competence, followed by focused learning in areas which the assessment highlights is required as well as re-assessment to provide assurance that learning has been effective. We received an update on the programme of externally conducted in-country risk reviews and the proposed next steps.

(Emphases added.)

30.     On July 31, 2014, BT Group issued a press release and filed Current Report on Form 6-K with the SEC, announcing the Company's financial and operating results for the quarter ended June 30, 2014 (the "Q1 2014 6-K").  For the quarter, BT Group reported net income of £441 million, or £0.05 per diluted share, on revenue of £4.35 billion, compared to net income of £346 million, or £0.04 per diluted share, on revenue of £4.45 billion for the same period in the prior year.

31.     On October 30, 2014, BT Group issued a press release and filed Current Report on Form 6-K with the SEC, announcing the Company's financial and operating results for the quarter ended September 30, 2014 (the "Q2 2014 6-K").  For the quarter, BT Group reported net income of £446 million, or £0.06 per diluted share, on revenue of £4.44 billion, compared to net income of £613 million, or £0.07 per diluted share, on revenue of £4.49 billion for the same period in the prior year.

32.     On January 30, 2015, BT Group issued a press release and filed Current Report on Form 6-K with the SEC, announcing the Company's financial and operating results for the quarter ended December 31, 2014 (the "Q3 2014 6-K").  For the quarter, BT Group reported net income of £558 million, or £0.07 per diluted share, on revenue of £4.47 billion, compared to net income

of £493 million, or £0.06 per diluted share, on revenue of £4.6 billion for the same period in the prior year.

33.     On May 21, 2015, BT Group filed an annual report on Form 20-F with the SEC, announcing the Company's financial and operating results for the quarter and fiscal year ended March 31, 2015 (the "2015 20-F").  For the quarter, BT Group reported net income of £690 million, or £0.08 per diluted share, on revenue of £4.71 billion, compared to net income of £566 million, or 0.07 per diluted share, on revenue of £4.78 billion for the same period in the prior year.  For fiscal year 2015, BT Group reported net income of £2.13 billion, or £0.26 per diluted share, on revenue of £19.98 billion, compared to net income of £2.01 billion, or £0.25per diluted share, on revenue of £18.28 billion for fiscal year 2014.

34.     In the 2015 20-F, BT Group stated, in pertinent part:

**Business integrity and ethics**

***We are committed to maintaining high standards of ethical behaviour***, and have a zero tolerance approach to bribery and corruption.

We have to comply with a wide range of local and international anti-corruption and bribery laws. In particular the UK Bribery Act and US Foreign and Corrupt Practices Act (FCPA) provide comprehensive anti-bribery legislation. Both have extraterritorial reach and so cover our global operations. As we expand globally, we are increasingly operating in countries identified as having a higher risk of bribery and corruption. We also have to ensure compliance with trade sanctions, and import and export controls.

. . .

**BT Global Services**

The UK is our largest region by revenue. Financial institutions and government and healthcare customers are particularly important in this market. We have been ranked by Current Analysis as the number one provider in the UK public sector, as well as a leader in the UK IP telephony and unified communications market.

We have a strong presence in Continental Europe, with national networks and metropolitan fibre rings in most major markets, including Belgium, France, Germany, Italy, the Netherlands and Spain. In this region we serve a large number

of customers in the pharmaceutical, retail, financial services and automotive industries.

. . .

**Corporate governance statement**

***We are committed to operating in accordance with best practice in business integrity and ethics and maintaining the highest standards of financial reporting and corporate governance. The directors consider that BT has applied the main principles of the UK Corporate Governance Code*** (the Code) as described on pages 93 to 136 of this Report of the Directors. The directors also consider that BT has complied with the Code provisions as currently in effect throughout the year, other than for five weeks (23 March–30 April 2014) when the Remuneration Committee comprised two (not three) members (Code provision D.2.1). Please see page 121 for further details of the Remuneration Committee membership.

. . .

**The Board**

. . .

During 2014/15, we also had in-depth discussions on external technology and market trends, UK mobile market and mobility, BT TV and BT Sport, the pension scheme and human rights.

***We visited our Italy business, and while there we reviewed operational matters with senior managers***, met with employees as well as customers, government officials and opinion leaders. We also visited Openreach to see customer service in action and spent time on site visits with our engineers.

. . .

**Internal control and risk management**

BT has in place an internal control environment to protect the business from material risks which have been identified within the group. Management is responsible for establishing and maintaining adequate internal controls over financial reporting and we have responsibility for ensuring the effectiveness of these controls. To enable us to do this, each quarter the lines of business certify compliance with the Turnbull guidance and Sarbanes-Oxley internal financial controls. Management reports the outcomes of these reviews to us and no significant weaknesses were identified in the annual review.

BT's risk management processes which have been in place throughout the period under review identify and monitor the risks facing the group. The risks which are

considered material are reviewed regularly by the *Operating Committee* and the Board.

During the year we heard from the Chief Executive on the enterprise-wide risk management process and the key risks facing the group as a whole. We heard from each line of business CEO on the key risks in their part of the business as well as the actions they are taking to address them.

[The Company] reported last year that the committee had given particular focus to BT's operations in Italy and Brazil. We have continued to monitor the position and significant progress has been made to improve the control environment. We continue to keep under review the current trends of security risks facing BT and the progress made to manage these risks.

. . .

**Governance and compliance programmes**

BT's group director of ethics and compliance presented at our first meeting of the year on his strategic priorities for the year ahead. These included driving ethics and compliance as integral components of BT's culture and learning. We also discussed at that meeting BT's programme to monitor compliance with our ACB obligations, improvements that had been made and the continued focus on monitoring agents' compliance with these obligations. We subsequently reviewed the proposed approach to our reviews of legal entity and agent compliance with our ACB policies and our plan through to 2016, including how internal audit and group compliance work together to assure compliance with ACB policies in particular jurisdictions.

We reviewed, during the year, a number of BT's other core compliance programmes:

• our international telecommunications regulation and compliance programme which is aimed at both managing telecommunications regulatory risk and also supporting business growth;

• our environment compliance programme including improvements in the control framework in the UK and planned improvements in environmental training and awareness;

• enhancements to the operation of our conflicts of interest policy including additional pre-employment checks and the creation of a central register of potential conflicts of interest; and

• our conflict minerals compliance programme, its progress and future plans.

We supported the proposal to roll out a bespoke face-to-face competition law training programme for all UK-based lines of business. The programme will tailor

the training to the risks relevant to the line of business and make it relevant to people's day job.

In September we reviewed the progress made to put in place the improvements identified earlier in the year to 'Speak Up', BT's whistleblowing confidential hotline. Every quarter we received a presentation from the group director of ethics and compliance who provided an overview of the 'Speak Up' statistics and trends, as well as a summary of key cases and outcomes.

We discussed the progress made on a project outside the UK to clarify our country managers' governance and compliance role.

. . .

**How we tailored our audit scope**

. . .

For three reporting units (UK, Italy and Germany), an audit of the complete financial information was performed. In a further four reporting units, specific audit procedures on revenue and receivables, purchases and payables, cash and provisions were performed. This, together with additional procedures performed on centralised functions and at the group level, gave us the evidence we needed for our opinion on the consolidated financial statements as a whole.

The group engagement team performed the audit of the UK reporting unit. The group team visited Italy and Germany and conference calls were held with these teams on a regular basis. The group engagement team was also involved in the audits of the four reporting units for which specific audit procedures were performed through a combination of visits and conference calls.

The reporting units within the scope of our group audit procedures accounted for over 80% of the group's revenue and profit before tax.

(Emphases added.)

35.     The 2015 20-F contained signed certifications pursuant to SOX by Defendants Patterson and Chanmugam, stating that the financial information contained in the 2015 20-F was accurate and disclosed any material changes to the Company's internal controls over financial reporting.

36.     On July 30, 2015, BT Group issued a press release and filed Current Report on Form 6-K with the SEC, announcing the Company's financial and operating results for the quarter

15

ended June 30, 2015 (the "Q1 2015 6-K").  For the quarter, BT Group reported net income of £511 million, or £0.06 per diluted share, on revenue of £4.36 billion, compared to net income of £441 million, or £0.05 per diluted share, on revenue of £4.35 billion for the same period in the prior year.

37.     On October 29, 2015, BT Group issued a press release and filed Current Report on Form 6-K with the SEC, announcing the Company's financial and operating results for the quarter ended September 30, 2015 (the "Q2 2015 6-K").  For the quarter, BT Group reported net income of £525 million, or £0.06 per diluted share, on revenue of £4.46 billion, compared to net income of £446 million, or £0.06 per diluted share, on revenue of £4.44 billion for the same period in the prior year.

38.     On February 1, 2016, BT Group issued a press release and filed Current Report on Form 6-K with the SEC, announcing the Company's financial and operating results for the quarter ended December 31, 2015 (the "Q3 2015 6-K").  For the quarter, BT Group reported net income of £796 million, or £0.09 per diluted share, on revenue of £4.63 billion, compared to net income of £558 million, or £0.07 per diluted share, on revenue of £4.47 billion for the same period in the prior year.

39.     On May 19, 2016, BT Group filed an annual report on Form 20-F with the SEC, announcing the Company's financial and operating results for the quarter and fiscal year ended March 31, 2016 (the "2016 20-F").  For the quarter, BT Group reported net income of £756 million, or £0.08 per diluted share, on revenue of £5.58 billion, compared to net income of £690 million, or £0.08 per diluted share, on revenue of £4.71 billion for the same period in the prior year.  For 2016, BT Group reported net income of £2.58 billion, or £0.30 per diluted share, on revenue of

£19.04 billion, compared to net income of £2.13 billion, or £0.26 per diluted share, on revenue of

£17.98 billion for 2015.

40.     In the 2016 20-F, BT Group stated, in pertinent part:

**Regions**

The UK is our largest region by revenue. Financial institutions and government and healthcare customers are particularly important in this market.

We have a strong presence in Continental Europe, with national networks and metropolitan fibre rings in most major countries, including Belgium, France, Germany, Italy, the Netherlands, the Republic of Ireland and Spain.

. . .

**Business integrity and ethics**

***We're proud of our high ethical standards. We don't tolerate bribery. We don't tolerate any forms of corruption.*** We follow a wide range of local and international anti-corruption and bribery laws – in particular the UK Bribery Act and US Foreign Corrupt Practices Act (FCPA). Both these pieces of legislation have extraterritorial reach, so cover our global operations. As we expand globally, we're increasingly operating in countries seen as having a higher risk of bribery and corruption. We also have to make sure we follow trade sanctions and import and export controls.

. . .

**Corporate governance statement**

We are committed to operating in accordance with best practice in business integrity and ethics and maintaining the highest standards of financial reporting and corporate governance. The directors consider that BT has complied throughout the year with the provisions of the UK Corporate Governance Code (the Code) as currently in effect and applied the main principles of the Code as described on pages 109 to 155 of this Report of the Directors. Please see page 120 for details of the *Audit & Risk Committee's* discussions on audit tendering.

. . .

**Governance programmes**

This year, we discussed a review of BT's governance operating model and framework, recent improvements to the Delegation of Authority framework, a project to clarify our governance and compliance roles outside the UK, and external governance developments on Board diversity and succession planning.

The aim of reviewing our governance framework is to ensure that governance in BT is clear and simple, to align with our culture and purpose. The review is ongoing; in December we endorsed the proposed next steps, and discussed the proposal to amend the terms of reference of our Regional Governance Committees to expand their oversight of risk. We asked the Chief Executive, Group Finance Director and Group General Counsel & Company Secretary to decide if this was appropriate and if so, gave them the authority to amend the terms of reference and seek endorsement from the *Operating Committee.*

In BT's non-UK operations, we have clarified our country managers' accountability for a common set of governance and compliance standards, and put in place a formal process to appoint new country managers. As a result, country managers are reporting a better understanding of their obligations. We are now focusing on how to embed the principles into how we work, assessing the capabilities and development needs of country managers, and providing appropriate assurance to the *Operating Committee.*

. . .

**How we tailored the audit scope**

. . .

For four reporting units (the principal UK trading company, EE, Italy and Germany), an audit of the complete financial information was performed. For EE the audit was performed on the period from the group's acquisition date, 29 January 2016. These units accounted for 79% of the group's revenue and 93% of the group's profit before tax.

In five reporting units, based on our risk assessment, specific audit procedures on revenue and receivables, payables and cash were performed. This, together with additional procedures performed on centralised functions and at the group level, gave us the evidence we needed for our opinion on the financial statements as a whole.

The group engagement team performed the audit of the UK and EE reporting units. The group team visited Italy and conference calls were held with both our teams in Italy and Germany on a regular basis. The group engagement team was also involved in the audits of the five reporting units for which specific audit procedures were performed through a combination of visits and conference calls.

(Emphasis added.)

41.     The 2016 20-F contained signed certifications pursuant to SOX by Defendants

Patterson and Chanmugam, stating that the financial information contained in the 2016 20-F was

accurate and disclosed any material changes to the Company's internal controls over financial reporting.

42.    On July 28, 2016, BT Group issued a press release and filed Current Report on Form 6-K with the SEC, announcing the Company's financial and operating results for the quarter ended June 30, 2016 (the "Q1 2016 6-K").  For the quarter, BT Group reported net income of £588 million, or £0.06 per diluted share, on revenue of £5.77 billion, compared to net income of £511 million, or £0.06 per diluted share, on revenue of £4.36 billion for the same period in the prior year.

43.    The statements referenced in ¶¶ 21-42 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company's Italian division had for years engaged in improper accounting practices; (ii) as a result, BT Group significantly overstated its earnings throughout the Class Period; (iii) the foregoing facts, when they became known, would foreseeably cause BT Group to cut its revenue, earnings, and free cash flow forecasts; and (iv) as a result of the foregoing, BT Group's public statements were materially false and misleading at all relevant times.

**The Truth Emerges**

44.    On October 27, 2016, BT Group announced that the Company had uncovered "inappropriate management behavior" at its Italian division.  BT Group stated, in part:

*BT Italia investigation*

Following allegations of inappropriate management behaviour in our BT Italia operations, we have conducted an initial internal investigation. This included a review of accounting practices during which we have identified certain historical accounting errors and reassessed certain areas of management judgement.

19

We have written down the value of items on the balance sheet by £145m. This is our current best estimate of the financial impact based on our internal investigation. The write down relates to balances that have built up over a number of years and our assessment is that the errors have not materially impacted the group's reported earnings over the previous two years. The amount has been charged as a specific item in our results for the quarter. As a non-cash item in the period it does not impact normalised free cash flow.

A full investigation of these matters is ongoing and we have appointed external advisers to assist with this. Appropriate action will be taken as the investigation progresses.

Our outlook is not affected.

45.     On this news, BT Group's ADR price fell $0.57, or 2.39%, to close at $23.25 on October 27, 2016.

46.     On January 24, 2017, BT Group issued a news release entitled "Update on investigation into BT's Italian business and on BT Group outlook."  The news release stated, in relevant part:

The investigation into the financial position of our Italian business is now substantially complete. ***The adjustments identified have increased from the £145m announced in our halfyear update to a total of around £530m***. We are still evaluating what proportion of the total adjustments should be treated as prior year errors, and what proportion should be treated as the reassessment in the current year of management estimates. Work is also ongoing to establish how these adjustments should be reflected in BT Group's financial statements for the current and previous periods in light of applicable accounting requirements.

. . .

The improper behaviour in our Italian business is an extremely serious matter, and we have taken immediate steps to strengthen the financial processes and controls in that business. We suspended a number of BT Italy's senior management team who have now left the business. We have also appointed a new Chief Executive of BT Italy who will take charge on 1 February 2017. He will review the Italian management team and will work with BT Group Ethics and Compliance to improve the governance, compliance and financial safeguards in our Italian business.

Further, we are conducting a broader review of financial processes, systems and controls across the Group. The BT Group Remuneration Committee will consider the wider implications of the BT Italy investigation.

Gavin Patterson, Chief Executive BT Group plc, said:

"***We are deeply disappointed with the improper practices which we have found in our Italian business.*** We have undertaken extensive investigations into that business and are committed to ensuring the highest standards across the whole of BT for the benefit of our customers, shareholders, employees and all other stakeholders."

. . .

As a result of the outcome of the BT Italy investigation and the pressures in the UK public sector and international corporate markets, we now expect underlying revenue excluding transit adjusted for the acquisition of EE to be broadly flat in 2016/17 and adjusted EBITDA to be around £7.6bn. Normalised free cash flow is now expected to be around £2.5bn.

For 2017/18, we now expect both underlying revenue excluding transit and adjusted EBITDA to be broadly flat year on year. We expect normalised free cash flow to be £3.0bn - £3.2bn.

(Emphases added.)

47.     On this news, BT Group's ADR price fell $5.05, or 20.67%, to close at $19.38 on January 24, 2017.

48.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

49.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired BT Group ADRs during the Class Period (the "Class"), and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate

families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

50.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, BT Group ADRs were actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by BT Group or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

51.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

52.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

53.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of BT Group;

- whether the Individual Defendants caused BT Group to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of BT Group ADRs during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

54.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

55.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- BT Group ADRs are traded in an efficient market;

- the Company's ADRs were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's ADRs; and

- Plaintiff and members of the Class purchased, acquired and/or sold BT Group ADRs between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

56. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

57. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

58. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

59. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

60. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of BT Group ADRs; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire BT Group

securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

61.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for BT Group securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about BT Group's finances and business prospects.

62.      By virtue of their positions at BT Group, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

63.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of BT Group, the Individual Defendants had knowledge of the details of BT Group's internal affairs.

64.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.   Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of BT Group.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to BT Group's businesses, operations, future financial condition and future prospects.   As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of BT Group securities was artificially inflated throughout the Class Period.   In ignorance of the adverse facts concerning BT Group's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired BT Group ADRs at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

65.     During the Class Period, BT Group ADRs were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired BT Group ADRs at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of BT Group ADRs was substantially lower than the prices paid by Plaintiff and the other members of the Class.

The market price of BT Group ADRs declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

66.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

67.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's ADRs during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)**

68.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

69.     During the Class Period, the Individual Defendants participated in the operation and management of BT Group, and conducted and participated, directly and indirectly, in the conduct of BT Group's business affairs.  Because of their senior positions, they knew the adverse non-public information about BT Group's misstatement of income and expenses and false financial statements.

70.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to BT Group's financial condition and results of operations, and to correct promptly any public statements issued by BT Group which had become materially false or misleading.

71.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which BT Group disseminated in the marketplace during the Class Period concerning BT Group's results of operations.   Throughout the Class Period, the Individual Defendants exercised their power and authority to cause BT Group to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of BT Group within the meaning of Section 20(a) of the Exchange Act.   In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of BT Group securities.

72.     Each of the Individual Defendants, therefore, acted as a controlling person of BT Group.   By reason of their senior management positions and/or being directors of BT Group, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, BT Group to engage in the unlawful acts and conduct complained of herein.   Each of the Individual Defendants exercised control over the general operations of BT Group and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

73.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by BT Group.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

<u>**DEMAND FOR TRIAL BY JURY**</u>

Plaintiff hereby demands a trial by jury.

Dated: January 25, 2017

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Jeremy A. Lieberman*
Jeremy A. Lieberman
J. Alexander Hood II
Hui M. Chang
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
Email:  jalieberman@pomlaw.com
          ahood@pomlaw.com
          hchang@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:   (312) 377-1184
Email:  pdahlstrom@pomlaw.com

*Attorneys for Plaintiff*

## CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.   I, Alex Jarrat _____, make this declaration pursuant to Section

27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange

Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2. I have reviewed a Complaint against BT Group plc ("BT" or the "Company"), and authorize the

filing of a comparable complaint on my behalf.

3.   I did not purchase or acquire BT securities at the direction of plaintiffs counsel or in order to

participate in any private action arising under the Securities Act or Exchange Act.

4.   I am willing to serve as a representative party on behalf of a Class of investors who purchased or

acquired BT securities during the class period, including providing testimony at deposition and trial, if

necessary. I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5. To the best of my current knowledge, the attached sheet lists all of my transactions in BT securities

during the Class Period as specified in the Complaint.

6.   During the three-year period preceding the date on which this Certification is signed, I have not

sought to serve as a representative party on behalf of a class under the federal securities laws.

7.   I agree not to accept any payment for serving as a representative party on behalf of the class as set

forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses

directly relating to the representation of the class as ordered or approved by the Court.

8. I declare under penalty of perjury that the foregoing is true and correct.

Executed  1/25/2017
           **(Date)**

_____
          **(Signature)**

Alex Sarraf
          **(Type or Print Name)**

**BT GROUP PLC (BT)**                                          **Samar, Alex**

### LIST OF PURCHASES AND SALES

| DATE | PURCHASE OR SALE | NUMBER OF SHS/UTS | PRICE PER SH/UT |
|------|------------------|-------------------|-----------------|
| 6/27/2016 | Purchase | 16 | $25.2975 |